**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SEARS HOME APPLIANCE SHOWROOMS, LLC and SEARS OUTLET STORES, LLC, | ) ) ) | No. 17 CV 8478 |
| | ) | |
| Plaintiffs/Counter-Defendants, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| CHARLOTTE OUTLET STORE, LLC, *et al.*, | ) ) | |
| | ) | June 21, 2018 |
| Defendants/Counter-Plaintiffs. | ) | |

**MEMORANDUM OPINION and ORDER**

This diversity action stems from the breakdown of the parties' franchise relationship. Sears Home Appliance Showrooms, LLC ("SHAS") and Sears Outlet Stores, LLC ("Sears Outlet") have sued Charlotte Outlet Store, LLC, Concord Outlet Store, LLC, Greenville Outlet Store, LLC, Raleigh Outlet Store, LLC (collectively, "Defendant LLCs"), Vadim Shlangman, and Aliaksandr Ivannikau alleging that they breached franchise agreements allowing Defendants to operate four Sears Outlet Stores in North Carolina and South Carolina. Defendants filed 11 counterclaims alleging breach of contract and various forms of fraud. Before the court are Plaintiffs' Motion to Dismiss and to Strike Portions of Counterclaims, (R. 35), and Defendants' Motion to Amend Counterclaims Instanter, (R. 58).[1] For

---

[1] The parties have consented to this court's jurisdiction pursuant to 28 U.S.C. § 636(c). (R. 19.)

the following reasons, Plaintiffs' motion is granted and Defendants' motion is denied without prejudice:

## Facts

The following facts are gleaned from Defendants' counterclaims and are taken as true for purposes of the current motion to dismiss. *See Berger v. NCAA*, 843 F.3d 285, 289-90 (7th Cir. 2016). On January 22, 2015, Defendant LLCs entered into Franchise Agreements and First Amendments to the Franchise Agreements with SHAS to take over preexisting franchise stores in Concord, Charlotte, and Raleigh, North Carolina and in Greenville, South Carolina. (R. 30, Counterclaims ¶¶ 1, 4.) Under the agreements, Defendants were to use the franchised locations to sell home appliances, hardware, tools, and lawn and garden equipment to be supplied exclusively by Plaintiffs. (Id. ¶ 5.) Shlangman and Ivannikau signed a Guaranty and Assumption of Franchisee's Obligations for each of the four franchise agreements. (Id. ¶ 2.) Defendants took possession of the four Sears Outlet franchise stores on February 15, 2015, at which time they retained most of the employees who had been operating those stores before the parties signed the Franchise Agreements. (Id. ¶ 4.)

Less than two weeks after Defendants took possession of the franchises, Plaintiffs sent an outside auditor to perform a biannual inventory scan, which led to a finding that a significant amount of inventory was missing from the Raleigh store. (Id. ¶ 6.) Defendants discovered that the inventory had been stolen by some of the employees they had retained when Defendant took over the franchise. (Id. ¶ 7.)

Plaintiffs knew about the employee theft problem at the Raleigh location but did not disclose that information to Defendants before they executed the franchise agreement for the Raleigh store.  (Id. ¶¶ 8, 10.)

The Amended Franchise Agreements state that Plaintiffs will provide Defendants with the consigned items necessary to maintain adequate inventory levels in the ordinary course of business, but according to the counterclaims, beginning in 2016 Plaintiffs regularly failed to provide sufficient inventory.  (Id. ¶¶ 11, 13.)  Specifically, the inventory deliveries did not meet Defendants' needs or requests, and often included off-season merchandise that was in an unsellable condition.  (Id. ¶¶ 14-16.)  Because of the deficient inventory deliveries, Defendants were unable to maintain store floor plans or meet customer demands and had difficulty meeting company and consumer standards.  (Id. ¶¶ 18, 23.)

Although their shipments to franchise-owned stores were deficient, Plaintiffs supplied their own company-owned and operated stores above and beyond their franchisees' stores.  (Id. ¶ 20.)  Plaintiffs prioritized inventory deliveries to company-owned stores without disclosing this preferential treatment to Defendants. (Id. ¶ 21.)

Defendants notified Plaintiffs about their concerns regarding the insufficient inventory shipments on an on-going basis beginning in late 2016.  (Id. ¶ 24.)  Sears Outlet often responded by blaming SHAS for the inadequate deliveries and by promising that SHAS would fix the problems.  (Id. ¶ 25.)  After Defendants attempted several times to raise their concerns, Plaintiffs sent a notice of default to

Defendants on June 14, 2017. (Id. ¶¶ 38-39.) After unsuccessful attempts at mediation and negotiation, on November 12, 2017, Defendants announced that they were terminating all four Franchise Agreements and returning all assets to Plaintiffs. (Id. ¶¶ 41-43.) Three days later, Plaintiffs issued notices of default and termination of Franchise Agreements for all four franchise locations. (Id. ¶ 44.) Plaintiffs filed this lawsuit shortly thereafter and on January 15, 2018, Defendants filed the current counterclaims.

## Analysis

### A.    Motion to Dismiss Counterclaims

In reviewing a motion to dismiss the court takes all of the well-pleaded facts as true and views them in the light most favorable to the pleading party. *See Berger*, 843 F.3d at 289-90. To survive a motion to dismiss under Rule 12(b)(6), the claims—or in this case, counterclaims—"must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *See id.* at 290 (quotations and citations omitted). Although "detailed factual allegations" are not required, the pleading party must do more than rest on "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). That standard is higher with respect to fraud claims, which demand "pleading with particularity the circumstances constituting fraud," *see* Fed. R. Civ. P. 9(b), meaning the allegations "must describe the who, what, when, where, and how of the fraud," *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (quotation and citation

omitted). That heightened standard is designed to require a plaintiff to engage in a careful pretrial investigation, to prevent irresponsible allegations of fraud from being lodged simply to cast blame after suffering a loss, and to allow a defendant to respond quickly to groundless claims of fraud that might cause reputational harm during the litigation process. *See id.* On the other side of that pleading coin, a party may plead itself out of court by alleging facts demonstrating that it has no legal claim. *See Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011).

As a general rule the court is limited at the motion to dismiss stage to considering the four corners of the complaint, but an exception exists for "documents that are critical to the complaint and referred to in it." *Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). Here the Franchise Agreements are referred to throughout Defendants' counterclaims and were filed under seal by Plaintiffs after a protective order was put in place.[2] (R. 66.) Because they are central to the counterclaims, the court may consider the Franchise Agreements without converting the motion to dismiss into a motion for summary judgment. *See id.*; *Williamson v. Curran*, 714 F.3d 432, 435-36 (7th Cir. 2013).

### 1. Breach of Contract Claims (Counts I-IV)

Plaintiffs seek to dismiss counterclaims one through four, which allege that Plaintiffs breached each of the Franchise Agreements by failing to satisfy inventory

---

[2] In their complaint Plaintiffs referred to the Franchise Agreements as "exhibits" to the complaint even though they waited to file the exhibits until after the protective order was in place. (R. 1, Compl. ¶ 13 n.1.) Under Rule 10(c), "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."

orders or to "provide sellable inventory or supply inventory in a manner that allowed Defendants to maintain adequate inventory levels." (R. 30, Counterclaims ¶¶ 51, 58, 65, 72.) Plaintiffs argue that all four counterclaims should be dismissed with respect to Sears Outlet and the individual Defendants because none of them are parties to the Franchise Agreements. They further argue that the Franchise Agreements' contractual one-year limitations period precludes any claims based on alleged breaches that took place before January 15, 2017, one year before the date on which Defendants filed their counterclaims.

In response to the motion to dismiss, Defendants concede that Shlangman and Ivannikau are not proper counterplaintiffs with respect to the breach of contract claims, but argue that Sears Outlet is a proper defendant despite not being a party to the Franchise Agreements. (R. 43, Defs.' Resp. at 1 n.1, 6.) In support of that argument, they point to the doctrine of apparent authority. Under Illinois law—which the parties agree governs the breach of contract claims under the Franchise Agreements' choice-of-law provisions—an agent may bind its principal where "(1) the principal consents to or knowingly acquiesces in the agent's conduct, (2) the third party has a reasonable belief that the agent possesses authority to act on the principal's behalf, and (3) the third party relied to his detriment on the agent's apparent authority." *Bethany Pharmacal Co., Inc. v. QVC, Inc.*, 241 F.3d 854, 859 (7th Cir. 2001). According to Defendants, Sears Outlet is liable for breach of contract as an agent of SHAS because the Franchise Agreements' amendments state that:

we [SHAS] or our affiliates shall provide you with all necessary amounts of Consigned Items so that your store is fully stocked on the day you take over control of the Store and open for business. Thereafter, we shall provide you with Consigned Items as necessary for you to maintain adequate inventory levels of all Consigned Items in the ordinary course of business.

(R. 66, Ex. A, Franchise Agreement ("F.A.") § 5.C.5.)  In other words, Defendants argue that because the Franchise Agreements' amendments reference SHAS's "affiliates," Sears Outlet is liable for breach of contract based on failure to provide adequate inventory.

Defendants' argument fails for several reasons.  First, the fact that the Franchise Agreements reference SHAS affiliates in connection with inventory obligations does not make those affiliates parties to the agreements.  *See Northbund Grp., Inc. v. Norvax, Inc.*, 795 F.3d 647, 650 (7th Cir. 2015) ("The core principle of corporate law is that a corporation is a distinct legal entity, separate from its … affiliated corporations, so that the obligations of a corporation are not shared by affiliates.").  Second, it is "a basic principle of contract law" that a contract is not binding upon a non-party to the agreement.  *Carter v. SSC Odin Operating Co., LLC*, 2012 IL 113204 ¶ 30.  Third, Defendants' agency theory gets things backwards.  Under Illinois's agency doctrine, an apparent agent can enter into an agreement that is binding on its principal where the principal creates the appearance of authority in the agent.  *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 673 (7th Cir. 2004).  But here, SHAS entered into the Franchise Agreements on its own behalf, not on behalf of Sears Outlet, and Defendants point to no language suggesting that the agreements are binding on any of SHAS's

affiliates simply because a provision of the amendments to those agreements references unnamed affiliates. Nor have they alleged that SHAS was authorized or apparently authorized to bind any of its affiliates in contracting with Defendants. *See Bethany Pharmacal*, 241 F.3d at 859. For all of these reasons, neither the individual Defendants nor Sears Outlet is a proper party to the breach of contract counterclaims.

Moving to the contractual limitations period, the Franchise Agreements specify that:

> You [the Franchisee] agree that no cause of action arising out of or under this Agreement may be maintained by you against us unless brought before the expiration of one year after the act, transaction or occurrence upon which such action is based or the expiration of one year after you become aware of the facts or circumstances reasonably indicating that you may have a claim against [SHAS] hereunder, whichever occurs sooner, and that any action not brought within this period shall be barred as a claim, counterclaim, defense, or set-off.

(R. 66, Ex. A, F.A. § 19.H.) According to Plaintiffs, this limitations provision bars any breach of contract claim based on occurrences that took place before January 15, 2017, which is one year before Defendants filed their counterclaims. In response, Defendants argue that this limitations provision is unenforceable as a matter of law because, according to them, a contractual provision that shortens an otherwise statutory limitations period of 10 years under Illinois law to only 1 year "is *per se* unreasonable." (R. 43, Defs.' Resp. at 7.) In support Defendants point to a Massachusetts decision asserting that an agreement to shorten a limitations period is impermissible under Massachusetts law "unless 'the agreed upon limitations period is subject to negotiation by the parties.'" (Id. at 8 (emphasis omitted)

(quoting *Creative Playthings Franchising Corp. v. Reiser*, 978 N.E.2d 765, 766 (Mass 2012)).) Although Defendants assert that "[t]here is no reason to believe courts in Illinois would diverge from the Massachusetts ruling," they cite no Illinois cases discussing the negotiation requirement and develop no argument as to why they believe Illinois would follow Massachusetts's ruling.

In fact, under Illinois law, "[t]he parties to a contract may agree to a shortened contractual limitation period to replace a statute of limitations, so long as it is reasonable." *Country Preferred Ins. Co. v. Whitehead*, 2012 IL 113365, ¶ 29. Courts applying Illinois law have enforced one-year contractual limitations periods. *See, e.g., Sweiss v. Founders Ins. Co.*, 2017 IL App (1st) 163157, ¶¶ 59, 62; *Stephan v. Goldinger*, 325 F.3d 874, 877 (7th Cir. 2003) ("One year . . . is not an unreasonably short time for bringing a suit."); *Medrano v. Production Eng'g Co.*, 774 N.E.2d 371, 375-76 (Ill. App. Ct. 2002); *Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1206 (7th Cir. 1992) (finding six-month contractual limitations period enforceable under Illinois law); *Vill. of Lake in the Hills v. Ill. Emcasco Ins. Co.*, 506 N.E.2d 681, 684 (Ill. App. Ct. 1987); *Florsheim v. Travelers Indem. Co. of Ill.*, 393 N.E.2d 1223, 1228 (Ill. App. Ct. 1977). Because they have not developed any argument as to why the one-year limitations period otherwise applicable here is unreasonable, Defendants have not shown that the provision is unenforceable as a matter of law.

That said, generally the resolution of a limitations defense comes after the complaint stage because a complaint "need not anticipate defenses." *See Barry*

*Aviation, Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 688 (7th Cir. 2004). But where a litigant pleads facts demonstrating that the applicable limitations period has expired, the court may resolve the issue on a motion to dismiss. *Id.* Here, Defendants allege that they were aware of the inventory supply problems that allegedly violated the Franchise Agreements "beginning in late 2016," which is more than a year before they filed their counterclaims. (R. 30, Counterclaims ¶ 24.) A breach of contract claim accrues when the breach takes place, and when a contract contemplates on-going obligations, the limitations period may begin to run against independent breaches when they occur. *See Hassebrock v. Ceja Corp.*, 2015 IL App. (5th) 140037, ¶ 35. By claiming that some of the alleged breaches took place more than a year before they brought their counterclaims, Defendants may have pleaded themselves out of court on at least those breaches that pre-date January 15, 2017. *See Barry*, 377 F.3d at 688.

Perhaps recognizing their vulnerability on the grounds of the contractual limitations period, Defendants also argue that Plaintiffs should be estopped from asserting the limitations period, pointing to their allegations that "Sears Outlet often responded [to inventory shortage issues] by diverting the blame to SHAS and provided Defendants with false promises that SHAS would fix the problem soon or that they would find new vendors." (R. 43, Defs.' Resp. at 8; R. 30, Counterclaims ¶ 25.) Under Illinois law, "[a] party whose conduct has caused another to delay filing suit until after the limitations period has run may be estopped from asserting the statute of limitations as a bar to the action." *Weatherly v. Ill. Human Rights*

*Comm'n*, 788 N.E.2d 1175, 1181 (Ill. App. Ct. 2003). To support an assertion of equitable estoppel, Defendants must plausibly allege that Plaintiffs misrepresented or concealed material facts and that Defendants reasonably relied on those misrepresentations or omissions in delaying filing their claims. *See Sweiss*, 2017 IL App (1st) 163157 ¶¶ 50-51. Although estoppel is ordinarily an issue for the trier of fact, dismissal is appropriate where the claim states no facts consistent with estoppel. *See Vill. of Lake in the Hills*, 506 N.E.2d at 683.

Defendants' current allegations are insufficient to support their assertion of estoppel with respect to the one-year contractual limitations period. Defendants allege only that Sears Outlet, not SHAS, lulled them into complacency by providing illusory promises that SHAS would fix the inventory problems. (R. 43, Defs.' Resp. at 8.) But as explained above, Sears Outlet is not a party to the Franchise Agreements, and therefore it is not a party asserting its rights under the contractual limitations period. There are no allegations that SHAS made any representations that led Defendants to delay filing suit, and Defendants point to no cases suggesting that SHAS can be estopped from asserting the contractual limitations period based on representations made by a non-party to the contract. Moreover, Defendants allege that they relied on promises that the inventory problems could be worked out without resorting to a lawsuit. But the "mere pendency of negotiations" to arrive at an extra-judicial resolution does not support an estoppel assertion. *See Sweiss*, 2017 IL App (1st) 163157 ¶ 52; *see also Barry*, 377 F.3d at 689 (noting that equitable estoppel requires more than a defendant's

denial of liability).  Instead, Defendants must allege that SHAS misrepresented or concealed material facts in a way that prevented Defendants from filing suit in a timely manner.  *See Sweiss*, 2017 IL App (1st) 163157 ¶ 52.  Such allegations are absent here, and accordingly the counterclaims do not support Defendants' assertion of equitable estoppel.  *See Smith v. Union Pac. R.R. Co.*, 474 Fed. Appx. 478, 480-81 (7th Cir. 2012) (noting that district court correctly determined equitable estoppel inapplicable where plaintiff did not plead in complaint that defendant deceived him).

For these reasons, Plaintiffs' motion to dismiss counts one through four of the counterclaims is granted.  The breach of contract counterclaims are dismissed with prejudice to the extent that they are brought against Sears Outlet or by the individual Defendants.  The motion is granted without prejudice with respect to the breach of contract counterclaims against SHAS.  Defendants may amend counts one through four to the extent that their claims against SHAS accrued within the applicable one-year limitations period or to include allegations sufficient to support an assertion of equitable estoppel against SHAS.

### 2.    Breach of Covenant of Good Faith Claim (Count V)

Count five of Defendants' counterclaims purports to bring a claim for breach of the implied covenant of good faith and fair dealing.  (R. 30, Counterclaims ¶¶ 75-81.)  As Plaintiffs correctly point out, in Illinois the implied covenant of good faith and fair dealing does not support a separate cause of action, but rather is a guideline for the construction of contracts.  *See Brooklyn Bagel Boys, Inc. v.*

*Earthgrains Refrigerated Dough Prods., Inc.*, 212 F.3d 373, 381 (7th Cir. 2000). Defendants concede as much, stating in their response that they "will re-plead" their breach of contract claims to incorporate their allegations with respect to the implied covenant of good faith and fair dealing. Accordingly, Plaintiffs' motion to dismiss count five of the counterclaims is granted with prejudice.

### 3.  Fraud Claims (Counts VI, VII, X & XI)

Plaintiffs move to dismiss all four of Defendants' fraud counterclaims, which arise under the Illinois Consumer Fraud and Deceptive Business Practice Act ("ICFA"), 815 ILCS 505/2, Illinois common law, the North Carolina Unfair & Deceptive Trade Practice Act, and the South Carolina Unfair Trade Practices Act, respectively.  Although Plaintiffs make specific arguments targeted at those individual claims, they also argue globally that all four fraud claims fail to state a claim because, according to them, they are precluded by the Franchise Agreements' "no reliance" clause.  They also argue globally that Defendants failed to plead any of the fraud claims with the requisite particularity.  The court will address the global fraud arguments before turning, where necessary, to the more specific arguments based on the individual fraud statutes.

Starting with the "no reliance" clause argument, Plaintiffs argue that language in the Franchise Agreements precludes them from bringing fraud claims based on misrepresentations or omissions that induced them to enter those agreements.  Specifically, they point to language in which Defendants agreed that:

> My decision to purchase the franchise has not been influenced by any
> oral representations, assurances, warranties, guarantees or promises

whatsoever made by the Franchisor . . . [and that I am not] not relying on any statements, promises, representations, promises or assurances that are not specifically set forth in the Franchise Disclosure Document.

Plaintiffs attribute this language to "Franchise Agreements, Representations and Acknowledge Statement," but provide no pin cite, and it is not clear where in the exhibits the language can be found.[3] (R. 36, Pls.' Mem. at 8.) Plaintiffs also point to a clause that states:

[T]he recitals and exhibits to this Agreement are part of this Agreement, which together with the Operations Manual and our System Standards and any riders or addenda signed simultaneously with this Agreement, constitute our and your entire agreement, and supersede any and all prior agreements concerning its subject matter. There are no oral or other written understandings, representations, or agreements between you and us relating to the subject matter of this Agreement. We do not authorize and are not bound by any representation of any nature other than those expressed in this Agreement.

(R. 66, Ex. A, F.A. § 17.A.) According to Plaintiffs, these "unambiguous integration and non-reliance clauses" prevent any claim that Defendants justifiably relied on any misrepresentations they made outside of the Franchise Agreements. (R. 36, Pls.' Mem. at 8-9.) Neither side challenges the enforceability of these clauses.

To the extent Plaintiffs rely on Section 17.A of the Franchise Agreements, because that section "contains no reference to reliance," it is more accurately defined as an integration clause rather than a no-reliance clause. *See Vigortone AG Prods., Inc. v. PM AG Prods., Inc.*, 316 F.3d 641, 645 (7th Cir. 2002). "[T]he presence of an integration clause in the agreement does not bar the plaintiffs'

---

[3] The "Acknowledgments" section of the Franchise Agreements conveys similar language, but not the exact language Plaintiffs quote. (R. 66, Ex. A, F.A. § 24.)

actions for fraud." *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 968 (Ill. App. Ct. 2004); *see also Extra Equipamentos E Exportacao Ltda. v. Case Corp.*, 541 F.3d 719, 723 (7th Cir. 2008) (noting that most courts hold that an integration clause does not prevent "a disappointed party to the contract from basing a tort suit on proof that in the course of the negotiations the other party made fraudulent representations"). That is because integration clauses are meant to prevent a party from pointing to the parol evidence rule to argue that some agreement the contracting parties reached during negotiations should be read into the written contract. *See Vigortone*, 316 F.3d at 644. But the parol evidence rule does not apply to fraud claims because fraud is a product of tort law rather than contract law. *Id.* Because "an integration clause does not bar a claim of fraud based on statements not contained in the contract," *id.*, Section 17.A of the Franchise Agreements cannot bar Defendants' fraud claims.

Assuming arguendo that the quoted language from the "Representations and Acknowledge Statement" appears in the Franchise Agreements, according to Plaintiffs that language states that Defendants did not rely on any statements made outside the written agreement, and therefore qualifies as a "no-reliance clause." Because justifiable reliance is an element of any fraud claim, parties to a contract may "head off the possibility of a fraud suit" by incorporating a no-reliance clause into their written contract, "stating that neither party has relied on any representations made by the other." *Vigortone*, 316 F.3d at 644. But while a no-reliance clause may effectively ward off a fraudulent misrepresentation claim,

Illinois courts have suggested that a no-reliance clause will not bar a fraudulent concealment claim unless the clause specifically references omissions. *See Walls v. Vre Chi. Eleven, LLC*, No. 16 CV 4048, 2016 WL 5477554, at *3 (N.D. Ill. Sept. 29, 2016) (and cases cited therein). That is because "the reliance element for a claim of fraudulent concealment means reliance on the defendant's silence." *Id.* Because the clause Plaintiffs quote here refers only to "oral representations, assurances, warranties, guarantees or promises," and not omissions, the no-reliance clause does not preclude Defendants' fraud counterclaims to the extent they are based on fraudulent concealment. *See id.*

Turning to Plaintiffs' second argument as to all four of the fraud counterclaims, they argue that Defendants failed to meet Rule 9(b)'s heightened standards for pleading fraud. As noted above, that standard has often been described as requiring allegations regarding "the who, what, when, where, and how of the fraud." *Presser,* 836 F.3d at 776 (internal quotation and citation omitted). "To state a claim for fraudulent misrepresentation a plaintiff must allege: (1) a false statement of material fact; (2) known or believed to be false by the party making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance upon the truth of the statement; and (5) damage to the plaintiff resulting from such reliance." *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 734 (7th Cir. 2017) (quotation and citation omitted).

To the extent that Defendants' fraud claims assert that SHAS and Sears Outlet engaged in fraudulent misrepresentation, the allegations fall well short of

the Rule 9(b) standard. In each of the fraud claims, Defendants assert that Plaintiffs "made material misrepresentations" or that they entered into the Franchise Agreements "based on representations made by the plaintiffs." (R. 30, Counterclaims ¶¶ 87, 93, 125, 133.) But they do not identify what those misrepresentations were, how they were false, or why Defendants' reliance on those misrepresentations was justifiable. *See Toulon*, 877 F.3d at 734. Accordingly, their claims for fraudulent misrepresentation are insufficient to survive the motion to dismiss.

Defendants argue that their fraud claims rest not just on misrepresentations but also on Plaintiffs' alleged concealment of material facts. Where a party alleges fraudulent concealment, it must allege that the defendant concealed a material fact despite having a duty to disclose the fact to the plaintiff. *Toulon*, 877 F.3d at 737. Although Rule 9(b) requires pleading with particularity, there is no precise formulation for pleading fraud and the amount of detail required varies with the circumstances of each case. *Presser*, 836 F.3d at 776.

Defendants assert that their fraud claims are based on Plaintiffs' failure to disclose the inventory issues at the Raleigh store or their intent to prioritize company-owned stores for inventory deliveries over franchised stores. But as Plaintiffs point out, those allegations assert only that "it would be impractical to believe Plaintiffs were unaware of the issue" at the Raleigh store before they entered the Franchise Agreements. (R. 30, Counterclaims ¶ 95.) That kind of speculation is insufficient to meet the fraud standard, which is designed to require a

pleading party to conduct a reasonable investigation before lodging fraud claims. *See Presser*, 836 F.3d at 776. Elsewhere Defendants assert "[o]n information and belief, this conduct was occurring at the Raleigh Outlet Store location, and was known by Plaintiffs, prior to Defendants' purchase of the Raleigh Outlet Store franchise." (R. 30, Counterclaims ¶ 8.) The Seventh Circuit has held that "a plaintiff generally cannot satisfy the particularity requirement of Rule 9(b) with a complaint that is filed on information and belief." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 442-43 (7th Cir. 2011).

Defendants also allege that Plaintiffs omitted material facts about their "ability and intent to provide Defendants with adequate inventory," and that Defendants relied on those omissions to their detriment. (R. 30, Counterclaims ¶¶ 87-88.) But it is unclear from the counterclaims what the referenced intent was and how that intent was inconsistent with the Franchise Agreements' language stating that SHAS would ship inventory "based on our inventory stocking plan as we may periodically revise it." (Id. ¶ 12.)

In response to the motion to dismiss, Defendants assert that to the extent that their first attempt at pleading their fraud counterclaims falls short of Rule 9(b)'s requirements, they will amend those claims. (R. 43, Defs.' Resp. at 9.) Accordingly, the common law fraud counterclaim (count seven) is dismissed without prejudice to allow Defendants a chance to re-plead it with the particularity required by Rule 9(b). Turning to the arguments specific to the statutory fraud claims, there

are additional shortcomings with those claims beyond the pleading requirements, as described below.

### a.    ICFA Claim (Count VI)

Plaintiffs seek dismissal of the counterclaim Defendants bring under the ICFA, which prohibits unfair or deceptive business practices including the "suppression or omission of any material fact, with intent that others rely upon" the omission. *See* 815 ILCS 505/2. The heightened pleading standards under Rule 9(b) apply to ICFA claims, meaning that the counterclaim must allege "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Haught v. Motorola Mobility, Inc.*, No. 12 CV 2515, 2012 WL 3643831, at *2 (N.D. Ill. Aug. 23, 2012). According to Defendants' counterclaim, Plaintiffs violated the ICFA by failing to disclose to Defendants that the Raleigh store experienced problems with missing inventory before executing the Franchise Agreements, and by misrepresenting their "ability and intent to provide Defendants with adequate inventory." (R. 30, Counterclaims ¶¶ 84, 87.) Plaintiffs argue that Defendants have not stated a claim under the ICFA because their allegations demonstrate that the relevant transactions took place primarily in North and South Carolina, not in Illinois. Defendants have not responded in any meaningful way to this argument. (R. 43, Defs.' Resp. at 12-13.)

In *Avery v. State Farm Mutual Automobile Insurance Company*, 216 Ill.2d 100, 185 (2005), the Illinois Supreme Court determined that "the General Assembly

did not intend the Consumer Fraud Act to apply to fraudulent transactions which take place outside Illinois." Accordingly, it held that "a plaintiff may pursue a private cause of action under the [ICFA] if the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois." *Id.* at 187. As the Seventh Circuit has recognized, "[t]hat's a fuzzy standard," *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011), that leads to "a highly fact-bound inquiry in which no single factor would be dispositive," *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 396 (7th Cir. 2009). The location of the defendant's headquarters and a choice-of-law provision designating Illinois law as controlling are both factors to be considered in locating the transaction's center of gravity, but neither is dispositive. *See Haught*, 2012 WL 3643831, at *4. Courts also look to factors such as where the plaintiff resides, where relevant services were rendered, where the items subject to the disputed transaction are located, where the contracts were signed, where allegedly deceptive statements or omissions were made, where payments were received, and where complaints about services were to be lodged. *See id.* at *3. Despite the fact-intensive nature of this inquiry, courts will dismiss an ICFA claim where the allegations demonstrate that "the circumstances of the alleged fraudulent activity did not occur primarily and substantially in Illinois." *See Crichton*, 576 F.3d at 397 (internal quotation marks omitted).

Although SHAS is located in Illinois and the Franchise Agreements include an Illinois choice-of-law provision, the rest of the allegations suggest that the relevant activity relating to the ICFA counterclaim took place primarily in North

and South Carolina. Defendant LLCs are North and South Carolina LLCs with their principal places of business in those states. (R. 30, Defs.' Ans. ¶¶ 3-6.) The franchise stores are located in those states. (Id. ¶ 12.) The alleged inventory shrinkage issue took place at the store located in Raleigh, North Carolina. (Id. Counterclaims ¶¶ 7-10.) The alleged inadequate inventory deliveries were made to the North and South Carolina stores. (Id. ¶ 14.) Because the non-resident Defendants bring these counterclaims based on "allegedly fraudulent representations that were devised in Illinois and received outside of the state," and because the center of the transactions Defendants complain of played out in North and South Carolina, they have "failed to allege that the conduct at issue here occurred 'primarily and substantially' in Illinois." *Haught*, 2012 WL 3643831, at *5; *Crichton*, 576 F.3d at 397. Especially considering Defendants' silence on the issue in response to Plaintiffs' motion to dismiss, that motion is granted with respect to the ICFA claim. Dismissal of count six is without prejudice to Defendants refiling the claim if they can plausibly allege that the conduct at issue here took place primarily and substantially in Illinois.

### b. Fraud Claims Under North Carolina and South Carolina Law (Counts X & XI)

Plaintiffs also argue that counterclaims ten and eleven should be dismissed with prejudice because fraud claims under North Carolina and South Carolina law are precluded by the Franchise Agreements' choice-of-law provision, which states that "all claims arising from the relationship between us and you will be governed by the laws of the State of Illinois." (R. 66, Ex. A, F.A. § 19.D.) In response,

Defendants do not argue that the choice-of-law provision is invalid, but rather assert without explanation that the provision "does not override statutory protection granted by the states where the franchisees reside." (R. 43, Defs.' Resp. at 14.) The cases they cite for that proposition do not support the assertion, and Defendants point to no authority for their argument that the "public policy *any* state has in protecting its residents from fraud" should prevent the application of the parties' contractual choice-of-law provision. (Id. (emphasis in original).) On the contrary, "[t]he fact that a different state may provide certain statutory rights for a plaintiff which are not available under the chosen state's law does not invalidate a choice-of-law provision as contrary to public policy." *WTM, Inc. v. Henneck*, 125 F. Supp. 2d 864, 868 (N.D. Ill. 2000). Because the applicable choice-of-law language here makes clear that Illinois law will govern not just contractual claims, but all claims related to the parties' relationship, Defendants are precluded from pursuing their fraud claims under North Carolina and South Carolina law. *See Facility Wizard Software, Inc. v. S.E. Tech. Servs., LLC*, 647 F. Supp. 2d 938, 945 (N.D. Ill. 2009) (dismissing North Carolina statutory fraud claims where contractual choice-of-law provision made Illinois law controlling). Accordingly, Plaintiffs' motion to dismiss counts ten and eleven is granted with prejudice.

### 4.     UCC Claim (Count VII)

Plaintiffs also seek to dismiss Defendants' counterclaim brought under two sections of Article 2 of the Illinois UCC. Defendants allege that Plaintiffs violated Section 2-306, which imposes on the seller an obligation "to use best efforts to

supply the goods," and Section 2-609, which states that "[a] contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired." 810 ILCS 5/2-306, 5/2-609. (R. 30, Counterclaims ¶¶ 106-09.) Plaintiffs argue that Defendants have failed to state a claim under Article 2 of the UCC because the parties have a consignment relationship, and Article 2 only applies to the sale of goods, with a "sale" being defined as "the passing of title from the seller to the buyer for a price." *See* 810 ILCS 5/2-106(1). As Plaintiffs point out, the Franchise Agreements state that they do not govern "a purchase and sale of the Merchandise," and make clear that "[a]t no time will [Defendants] acquire title to the Consigned Items." (R. 66, Ex. A, F.A. §§ 5.C.1-5.C.2.) More specifically, Defendant LLCs agreed that they "accept, and will accept, possession of the Consigned Items, as consignee, but the Consigned Items at all times will be under [SHAS's] or [SHAS's] affiliates' ownership, direction and control." (Id. § 5.C.1.)

Article 2 of the UCC only governs contracts for the sale of goods, 810 ILCS 5/2-102, but whether a contract is for the sale of goods or the sale of services is sometimes difficult to parse. In determining whether the UCC applies to a given contract, Illinois courts apply the "predominant purpose" test, asking whether the contract is predominantly for the sale of goods or services. *See Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill.2d 325, 352 (2002); *Geneva Int'l Corp. v. Petrof, Spol, S.R.O.*, 680 F. Supp. 2d 993, 999 (N.D. Ill. 2009). "If the contract's predominant purpose, or 'raison d'etre' is the sale of goods, then it is

governed by Article 2." *Zayre Corp. v. S.M. & R. Co., Inc.*, 882 F.2d 1145, 1153-54 (7th Cir. 1989). How the contracting parties "choose to describe their transaction is relevant in determining whether it is a contract for services or a sale of goods." *TDI Global Solutions, Inc. v. PCTI Holdings, Inc.*, No. 14 CV 2455, 2016 WL 1213914, at *2 (N.D. Ill. Mar. 29, 2016).

Although numerous jurisdictions have held that distributor and dealership agreements are predominantly for the sale of goods, *see Belleville Toyota*, 199 Ill.2d at 353 (and cases cited therein); *see also Geneva Int'l*, 680 F. Supp. 2d at 999, courts applying the predominant purpose test have been less quick to find that Article 2 applies in the context of franchise agreements for retail store operations, *see, e.g., DZ Bank AG Deutche Zentral-Genossenschaftsbank v. McCranie*, No. 16-14773, 2018 WL 345045, at *9 (11th Cir. Jan. 10, 2018) (addressing franchise agreement for insurance agency); *Noble Roman's v. Hattenhauer Distrib. Co.*, No. 1:14-cv-1734-WTL-DML, 2015 WL 1526074, at *3 (S.D. Ind. Apr. 3, 2015); *Rocky Mountain Chocolate Factory, Inc. v. SDMS, Inc.*, No. 06-cv-01212-WYD-BNB, 2007 WL 4268962, at *5 (D. Colo. Nov. 30, 2007); *Am. Casual Dining, LP v. Moe's S.W. Grill, LLC*, 426 F. Supp. 2d 1356, 1369-70 (N.D. Ga. 2006). Those cases have scrutinized the relevant franchise agreements and concluded that even though the agreements contemplate the sale of goods, those sales are incidental to the contracting relationship, which exists primarily for the purpose of granting franchise rights and enabling the franchisee to set up and operate a store using the franchisor's marks and products.

A key difference between the distributorship cases and the franchise agreement cases appears to be that a typical distribution agreement contemplates a sale of goods between the parties, with the distributor gaining the right to resell the products. *See, e.g., WICO Corp. v. Willis Indus.*, 567 F. Supp. 352, 354-55 (N.D. Ill. 1983); *Belleville Toyota*, 199 Ill.2d at 353-54. For example, in *Zayre*, 882 F.2d at 1154, the Seventh Circuit concluded that Article 2 applied to an agreement involving a store that became obliged to purchase jewelry from a company operating a jewelry stand inside the store. Because the store had to purchase jewelry at a markup and the plaintiff was seeking damages based on the store's refusal to pay for the jewelry, the court concluded that the parties' contract was primarily for the provision of goods rather than services. *Id.* But where the franchisor's profits may come from franchise fees and royalties rather than retail sales, non-sale aspects of the agreement may be more likely to predominate. *See, e.g., Noble Roman's*, 2015 WL 1526074, at *3; *Am. Casual Dining*, 426 F. Supp. 2d at 1370.

The court concludes that the predominant purpose of the Franchise Agreements is for the parties to establish a set of business-related rights and responsibilities with respect to Defendants' operation of a set of branded stores. Under those agreements, what SHAS granted to Defendant LLCs was a license and franchise to use SHAS's proprietary operating system and marks to operate a store. (R. 66, Ex. A, F.A. § 1.A.) Obviously, the eventual sale of goods is one purpose of the agreements, but under the structure of this franchise relationship Defendants facilitate the sale of Sears affiliate-owned goods to third parties. Although

Defendants gain possession of those goods before they are sold to customers, title and control in the goods remains with SHAS until the sale is complete. (Id. § 5.C.1.) Accordingly, no "sale of goods" takes place between the parties to the Franchise Agreements. Supporting that view, the Franchise Agreements explicitly disavow that they govern "a purchase and sale of the Merchandise." (Id. § 5.C.1.) Moreover, the main thrust of the Franchise Agreements is not about the nature or logistics of sales of Sears affiliate-owned goods, but rather about Defendants' use of Sears trademarks and copyrights, their operation of the stores, their obligations around insurance, record-keeping, and information systems, and the establishment of the exchange of fees and payments. Although the Franchise Agreements contemplate the eventual sale of goods, under the predominant purpose test, the court concludes that the Franchise Agreements themselves are predominantly for the provision of services. Accordingly, Article 2 of the UCC does not apply here and count eight must be dismissed with prejudice.

### 5. The Illinois Franchise Disclosure Act Claim (Count IX)

Finally, Plaintiffs seek to dismiss Defendants' counterclaim under Section 15 of the Illinois Franchise Disclosure Act ("IFDA"), which provides remedies for situations where "a franchisor has failed to demonstrate that adequate financial arrangements have been made to fulfill obligations to provide . . . inventory."[4] 815 ILCS 705/15. Defendants allege that the Franchise Agreements violate that

---

[4] In their motion to amend their counterclaims, Defendants seek to include an allegation under Section 6 of the IFDA. That request is addressed in Section C below.

provision because in Section 5.E they convey that Plaintiffs "do not guarantee that the Merchandise or the Display Merchandise we (or our affiliates) send to you will reflect the actual demand for Merchandise in your Store's market area." (R. 30, Counterclaim ¶ 113 (quoting F.A. § 5.E).) Defendants allege that Plaintiffs violated the IFDA because Section 5.E reflects an attempt "to remove their obligation to provide adequate inventory." (Id. ¶ 115.)

As Plaintiffs point out, "multiple courts have interpreted the IFDA to protect Illinois residents only," *H.C. Duke & Son, LLC v. Prism Mktg. Corp.*, No. 4:11-cv-04006-SLD-JAG, 2013 WL 5460209, at *8 (C.D. Ill. Sept. 30, 2013) (internal quotation omitted) (collecting cases), even where the franchise agreement includes an Illinois choice-of-law provision, *see Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 385 (7th Cir. 2003). That is because "by its own terms, the IFDA applies only to franchises located within the State of Illinois." *Cromeens*, 349 F.3d at 385. Although at least one court has questioned whether one specific IFDA provision, Section 6, applies to franchises located extra-territorially, *see, e.g., H.C. Duke & Son*, 2013 WL 5460209, at *9, Defendants offer no support for their assertion that Section 15 covers their franchises despite their locations in North Carolina and South Carolina. Accordingly, the motion to dismiss counterclaim nine is granted with prejudice, subject to the IFDA discussion set forth in Section C below.

**B.    Motion to Strike Portions of Counterclaims**

In addition to moving to dismiss the counterclaims, Plaintiffs ask this court to strike Paragraphs 29 through 37 and 80 from the counterclaims as "immaterial and scandalous."  (R. 36, Pls.' Mem. at 14.)  Specifically, they argue that allegations stating that Plaintiffs failed to pay timely commissions and miscalculated back-commissions, and allegations that that they mismanaged the brand by suspending the franchising of new stores are all immaterial and lacking in any pertinent background information.  (Id. at 14-15.)  Rule 12(f) allows a court to strike a pleading that is "redundant, immaterial, impertinent, or scandalous."  But motions to strike generally are disfavored in this district, *see Krukowski v. Aetna Health of Ill., Inc.*, No. 10 CV 5282, 2012 WL 88215, at *3 (N.D. Ill. Jan. 11, 2012), and "courts will strike portions of a complaint only if the challenged allegations are so unrelated to the present claim as to be void of merit and unworthy of consideration," *WTM*, 125 F. Supp. 2d at 870.  Despite Plaintiffs' conclusory labels for the relevant paragraphs, there is nothing prejudicial or obviously scandalous about the allegations, and they provide (perhaps somewhat tangential) context for Defendants' perspective on the breakdown of the parties' franchise relationships. Accordingly, the motion to strike is denied.

**C.    Motion to Amend Counterclaims Instanter**

Five days after Defendants filed their response to the current motion to dismiss, they filed a motion to correct the record, asking the court for leave to amend their IFDA counterclaim to include an allegation under Section 6 of the

IFDA, 815 ILCS 705/6. (R. 44.) The court granted the motion to the extent that it gave Defendants leave to file a motion to amend their counterclaims while addressing Plaintiffs' argument that any motion to amend would be futile. (R. 47.) Defendants complied with that order, but in the proposed amended counterclaims attached to their motion to amend instanter, they not only included an amended IFDA counterclaim under Section 6, but they added a new counter-defendant, inserted a civil RICO claim, and added allegations to their breach of contract and fraud claims. (See R. 58-1.) For the following reasons, the motion to amend is denied without prejudice to refiling the motion consistent with this opinion.

Beginning with the request to amend the IFDA claim, which was the premise of the original motion to correct the record, Defendants argue that they should be allowed to include a counterclaim under Section 6 of the IFDA. Section 6 prohibits fraudulent practices in connection with the offer or sale of any franchise, including untrue statements or omissions of material facts. *See* 815 ILCS 705/6. Defendants argue that Section 6—unlike the section on which their original IFDA counterclaim is based—applies to franchises located outside Illinois. (R. 58, Mot. to Amend at ¶ 10.) Under Section 6, "a sale of a franchise is made in this State when: (1) an offer to sell or buy a franchise is made in this State and accepted within or outside of this State[.]" 815 ILCS 705/6. Defendants argue that this language shows that Section 6 applies to franchises located outside of Illinois as long as the offer for sale originated in Illinois. But they cite no case that has applied Section 6 to a fraud claim brought by a franchisee located outside of Illinois. Although they highlight

29

one case that described Section 6 as having "its own jurisdictional limits," that case declined to resolve whether it implicitly applies to out-of-state franchises where the offer for sale took place in Illinois.[5] *See H.C. Duke & Son*, 2013 WL 5460209, at *9.

This court also declines to resolve the Section 6 question at this point because Defendants' proposed amended counterclaims do not cure the Rule 9(b) deficiencies highlighted in Section A above. The heightened pleading standards under Rule 9(b) apply to fraud claims under the IFDA. *Putzier v. Ace Hardware Corp.*, 50 F. Supp. 3d 964, 972 (N.D. Ill. 2014). In the proposed amended IFDA counterclaim, Defendants continue to rely on allegations that it would "be impractical to believe" that Plaintiffs were unaware of inventory shrinkage issues when they entered into the Franchise Agreements, and continue to couch allegations of misrepresentations in the inventory supply process on the language of "information and belief." (R. 58-1, Proposed Am. Counterclaims ¶¶ 38, 44, 87, 205.) Accordingly, Defendants' motion to amend counterclaim nine is denied without prejudice.[6]

Turning to the remaining arguments raised by Plaintiffs in response to the current motion to amend, they point out that the proposed amended counterclaims

---

[5] At least one treatise has adopted Defendants' interpretation of the scope of Section 6. *See* W. Michael Garner, 1 Franch. & Distr. Law & Prac. § 5:20 (Oct. 2017) ("The IFDL's broadest geographic reach is found in the prohibitions against fraudulent representations; there is no requirement that a franchisee or franchise business be located in the State of Illinois.").

[6] To the extent that Defendants amend their IFDA counterclaim under Section 6, they must bear in mind that as Plaintiffs point out the IFDA includes a provision stating that a claim must be brought before "the expiration of one year after the franchisee becomes aware of facts or circumstances reasonably indicating that he may have a claim for relief in respect to conduct governed by this Act." 815 ILCS 705/27.

add an entirely new party, Sears Hometown and Outlet Stores, Inc. ("SHOS"), and an entirely new RICO counterclaim without referring to those additions anywhere in their opening motion to amend. (R. 59, Pls.' Resp. at 2-3.) Defendants' motion addresses only the addition of the IFDA Section 6 claim, and yet the amended counterclaims attached to the motion include these significant substantive changes. This court will not attempt to address those changes without any argument in the motion as to why they should be allowed. Instead, because the proposed amended counterclaims include new allegations and parties discussed nowhere in the motion to amend instanter, and because requiring Defendants to conform any amended counterclaims to the rulings here is the most efficient way to proceed, the court denies the motion without prejudice to filing a new motion to amend the counterclaims to the extent that they believe they can amend the counterclaims consistent with this opinion.

## Conclusion

For the foregoing reasons, Plaintiffs' motion to dismiss is granted with prejudice with respect to counts five, eight, ten, and eleven. The motion is granted without prejudice with respect to counts six and seven. As for counts one through four, the motion is granted with prejudice to the extent that the breach of contract claims are brought by the individual Defendants or against Sears Outlet, but granted without prejudice to the extent they are brought by Defendant LLCs against SHAS. Finally, count nine is dismissed with prejudice to the extent that it seeks to state a claim under Section 15 of the IFDA, but without prejudice to the

extent that it seeks relief under IFDA Section 6. Second, Plaintiffs' motion to strike is denied. Third, Defendants' motion to amend their counterclaims instanter is denied without prejudice in that Defendants may file a new motion seeking leave to file a new set of amended counterclaims that are consistent with this opinion.

**ENTER:**

_Young B. Li_

**Young B. Kim**
**United States Magistrate Judge**